LAW OFFICES OF VINCENT E. BAUER
475 PARK AVENUE SOUTH, 25TH FLOOR
NEW YORK, NEW YORK 10016
Tel: 212-575-1517
Fax: 212-689-2726

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————————

GLENN BLOOM                                           06 CV 6301
                                                      (NRB)


                          Plaintiff,

    -   against   -


JASON T. ROCK, INTUITIVE TECHNOLOGIES,
LLC, RAHUL D. MISTRY, FDA SUBMIT,
and GLOBALSUBMIT, INC.
                          Defendants.


—————————————————————————


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**


                              **Law Offices of Vincent E. Bauer**
                              **475 Park Avenue South**
                              **New York, NY 10016**

                              **Tel: (212) 575-1517**
                              **Fax: (212) 689-2726**

                              **Attorneys for Defendants**

## TABLE OF CONTENTS

Table of Authorities.................................................................................i

Preliminary Statement.............................................................................1

Statement of Facts.................................................................................2

Argument ..........................................................................................11

I.   PLAINTIFF'S BREACH OF CONTRACT CLAIMS
     SHOULD BE DISMISSED ....................................................................11

         a. Plaintiff is Not Entitled to Post-Termination Commissions ........................11

         b. Plaintiff's Product Equity Claims Should be Dismissed............................15

         c. Plaintiff Cannot Recover "Royalties" Under the Product
            Equity Section of the Employment Agreement ....................................16

II.   PLAINTIFF'S FRAUD CLAIMS SHOULD BE DISMISSED.......................17

III.  PLAINTIFF'S CLAIM FOR RESTITUTION AND UNJUST
      ENRICHMENT SHOULD BE DISMISSED.............................................18

IV.   PLAINTIFF'S WRONGFUL TERMINATION CLAIM SHOULD
      BE DISMISSED.............................................................................19

V.    PLAINTIFF'S BREACH OF FIDUCIARY DUTY CLAIM SHOULD
      BE DISMISSED.............................................................................20

VI.   PLAINTIFF'S TORTIOUS INTERFERENCE CLAIMS SHOULD
      BE DISMISSED.............................................................................22

VII.  PLAINTIFF'S ALTER EGO AND RELATED FRAUD CLAIMS
      SHOULD BE DISMISSED..................................................................23

VIII. PLAINTIFF'S CLAIM FOR AN ACCOUNTING
      SHOULD BE DISMISSED..................................................................24

IX.   PLAINTIFF'S APPLICATIONS FOR INJUNCTIVE RELIEF
      ARE MOOT...................................................................................24

Conclusion………………………………………………………………..…25

# TABLE OF AUTHORITIES

**PAGE**

38 Sequoia Assocs., LLC v. Lumbermen's Mut. Cas. Co.,

114 Fed. Appx. 28 (2d Cir. 2004)...............................................................11

AGF York 57 L.P. v. Glikman, 24 Misc. 3d 1225A (Sup. Ct. N.Y. Cty. 2009)...........................19

Allerand, LLC v. 233 E. 18th St. Co., L.L.C., 19 A.D.3d 275 (1st Dep't 2005) .......................23

American Realty Co. v. Curran, 258 F. 118, 120 (2d Cir.1919).......................................16

Aon Fin. Prods. v. Societe Generale, 476 F.3d 90 (2d Cir. 2007)..............................11,11-12

Argent Elec., Inc. v. Cooper Lighting, Inc., 2005 U.S. Dist. LEXIS 18689 (S.D.N.Y

2005)...............................................................................................24

Auble v. Doyle, 38 A.D.3d 1264 (4th Dep't 2007)........................................................18

Barcellos v. Robbins, 50 A.D.3d 934 (2d Dep't 2008)...................................................20

Bouchard Transp. Co., Inc. v. New York Islanders Hockey Club, LP,

40 A.D.3d 897 (2d Dep't 2007)........................................................................19

Bridgestone/Firestone v. Recovery Credit Services, 98 F. 3d 13 (2d Cir. 1996)) .........................17

Eddy v. Prudence Bonds Corp., 165 F.2d 157 (2d Cir. 1947).........................................11

First Trust N.A. v. Moses & Singer, 2000 U.S. Dist. LEXIS 10957,

1-24 (S.D.N.Y. Aug. 4, 2000)..........................................................................22

Frishberg v. Esprit de Corp., 778 F. Supp. 793 (S.D.N.Y. 1991)

aff'd 969 F. 2d 1042(2d Cir. 1992).....................................................................12

Gibraltar Mgt. Co., Inc. v. Grand Entrance Gates, Ltd., 46 A.D.3d 747

(2d Dep't 2007) .......................................................................................18

Goldman v. Metro. Life Ins. Co., 5 N.Y.3d 561(2005)……………………...............18

Graff v. Enodis Corp., 2003 U.S. Dist. LEXIS 4899 (S.D.N.Y.2003) ……………………12

Horn v. N.Y. Times, 100 N.Y.2d 85 (2003)..…………………………………...….19

Hunt, Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274 (2d Cir. 1989)…………………12

IDT Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132 (2009)………………16

JHH Pictures, Inc. v. Rawkus Entm't LLC, 291 A.D.2d 356 (1st Dep't 2002) ……………23

Koret, Inc. v. Christian Dior, S.A., 161 A.D.2d 156 (1st Dep't 1990)………………………22

L & L Auto Distribs. & Suppliers Inc. v. Auto Collection, Inc.,
23 Misc. 3d 1139A (Sup. Ct. Kings Cty.  2009)……....……………………….................19

Locasio v. Aquavella, 185 A.D.2d 689 (4th Dep't 1992).………………………17

MTI/The Image Group, Inc. v. Fox Studios East, Inc., 262 A.D.2d 20(1st Dep't

1999).……………………………….…..…………..……………..……...................22

Mackie v. LaSalle Industries, Inc., 92 A.D.2d 821 (1st Dept. 1983).………………12

Mandelblatt v. Devon Stores, 132 A.D.2d 162, 167 (1st Dep't 1987)……………………16

McEntee v. Van Cleef & Arpels, Inc., 166 A.D.2d 359 (1st Dep't 1990)...………….........12

McGimpsey v. Robert Folchetti & Assocs., LLC, 19 A.D.3d 658 (2nd Dep't

2005).…………………………………………………………………………12

McHenry v Lawrence, 66 A.D.3d 650,651 (2d Dep't 2009)……………………...…………20

McKernin v. Fanny Farmer Candy Shops, Inc., 176 A.D.2d 233 (2d Dep't

1991).……………………………………………………………………17

Metropolitan Transportation Auth. v. Triumph Advertising Productions,

116 A.D.2d 526 (1st Dep't 1986).…………..…………………………...............17

Michnick v. Parkell Prods., 215 A.D.2d 462 (2d Dep't 1995)……………………………21,24

Milman v. Denniston, 271 A.D. 988 (2d Dep't 1947)………………………………...19

Nikitovich v. O'Neal, 40 A.D.3d 300 (1st Dep't 2007)...................................19

Nu-Life Constr. Corp. v. Board of Educ., 204 A.D.2d 106 (1st Dep't 1994).......................22

Philippine Sugar Estates Development Co. v. Government of Philippine Islands, 247 U.S.
385 (U.S. 1918)........................................................................................11

Production Products Co. v. Vision Corp., 270 A.D. 2d 922 (4th Dep't 2000)..............................12

R.B. Williams Holding Corp. v. Ameron Int'l Corp., 2001 U.S. Dist. LEXIS 2812
(W.D.N.Y. 2001)......................................................................................16

Reichert v. N. MacFarland Builders, Inc., 85 A.D.2d 767 (3d Dep't 1981).............................21,24

Sanshoe Trading Corp. v. Mitsubishi Int'l Corp., 122 Misc. 2d 585
(Sup. Ct. N.Y. Cty 1984).............................................................................21

Seigel v. Techlaw, Inc., 21 Misc. 3d 131A (N.Y. App. Term 2008)................................12

Silverman v. Keller, 2006 N.Y. Misc. LEXIS 4080, 1-47 (N.Y. Sup. Ct. 2006)...............21,23

Slater v. Gulf, M. & O. R. Co., 307 N.Y. 419 (1954)....................................................19

Sudul v. Computer Outsourcing Services, 868 F. Supp. 59, 62  (S.D.N.Y.
1994)...................17

Swits v. New York Systems Exchange, Inc., 281 A.D.2d 833 (3rd Dep't 2001)....................12

Terre Haute & I. R. Co. v. Indiana, 194 U.S. 579 (U.S. 1904)........................................11

Trakis v. Manhattanville Coll., 51 A.D.3d 778 (2d Dep't 2008)....................................20

UWC, Inc. v. Eagle Industries, Inc., 213 A.D.2d 1009 (4th Dep't 1995)............................12

Unclaimed Prop. Recovery Serv., Inc. v. UBS PaineWebber Inc.,
58 A.D.3d 526 (1st Dep't 2009).......................................................................18-19

Vitale v. Steinberg, 307 A.D.2d 107 (1st Dep't 2003)...................................................21

Waldman v. Englishtown Sportswear, Ltd., 92 A.D.2d 833 (1st Dep't 1983).......................21

Yenrab, Inc. v. 794 Linden Realty, LLC, 2009 N.Y. App. Div. LEXIS 8840

(2d Dep't Dec. 1, 2009)......................................................................18

Zaveri v. Rosy Blue, Inc., 4 A.D.3d 146 (1st Dep't 2004)...............................................12

## PRELIMINARY STATEMENT

Defendants Jason Rock, Intuitive Technologies, LLC, Rahul Mistry, FDAsubmit, and GlobalSubmit, Inc., by and through their attorneys, the Law Offices of Vincent E. Bauer, respectfully submit this memorandum of law in support of Defendants' motion for summary judgment. As set forth more fully below, notwithstanding Plaintiff's 45-page, 15 count Second Amended Complaint, he in actuality has only one potential claim, for breach of contract. That claim is based upon a two-page agreement. Pursuant to that agreement, Plaintiff, the former EVP of Sales and Marketing of Defendant Intuitive Technologies, LLC ("Intuitive"), had the right to receive sales commissions under circumstances set forth in that agreement. He also was entitled to receive a percentage of the proceeds of the sale of, or IPO in connection with, any product line he helped Intuitive create.

Plaintiff worked for Intuitive for only 12 months. During that time, he performed the traditional function of a sales representative in a company developing software products. Intuitive did not develop any marketable products during Plaintiff's tenure. Nor did it generate any revenues in connection with either Plaintiff's sales efforts or the development of any product on which Plaintiff made any contribution.

Plaintiff's employment was terminated by Intuitive in June 2003. Approximately one year later, Intuitive was presented with a business opportunity, and began development of a new product. Intuitive's employees devoted nearly 7000 staff-hours of work over the following more than one year developing that product. Ultimately, Intuitive's successor, GlobalSubmit, Inc., was successful in obtaining the FDA's agreement to use Intuitive's new software to review electronic submissions of applications by drug companies for FDA approval of new drugs. In

1

July 2005, nearly 25 months after Plaintiff left Intuitive, Intuitive began to generate revenues in connection with the licensing of its new software to drug companies.

Summary judgment dismissing each of Plaintiff's claims in this case is warranted for several reasons. First, as a matter of law, Plaintiff is not entitled to the sales commissions he seeks, since post-termination commissions are only recoverable where the parties have expressly so agreed, and Plaintiff concedes that no such agreement was reached in this case. Second, Plaintiff is not entitled to monies under his "product equity" theory, since the conditions precedent to any such right, a sale of, or initial public offering associated with, a product he helped create (or, in fact, any of Defendants' products), have not occurred. Third, Plaintiff's many derivative claims must be dismissed as they are simply not actionable under New York law. Accordingly, Defendants respectfully submit that Plaintiff's claims should be dismissed in their entirety.

## STATEMENT OF FACTS

Intuitive was founded in 1999 by Rahul Mistry, Jason Rock and Jason Fitzgerald. Intuitive was in the business of developing custom software solutions for its clients, and also providing software consulting services. Affidavit of Jason Rock ("Rock Aff."), ¶ 2. Between January 2000 and January 2003, Intuitive developed commercial software for Standard & Poor's, which S&P sold to its customers. *Id.*, ¶ 3. That data presentation software allowed users to compile and present in an organized fashion, similar to a website, large volumes of documents organized by those users. *Id.*, ¶ 4. That software also enabled readers of those "publications" to interpret and organize that documentation in a limited way. *Id.*, ¶ 5.

2

In or about January 2002, before meeting Plaintiff, Intuitive made a strategic decision to pursue the modification and development of the software created by it for Standard & Poor's ("S&P") to make it more generic, so that it could be sold to customers in a number of industries which needed to organize and present large amounts of information (e.g., financial institutions and law firms). *Id.*, ¶ 6. In early 2002, Plaintiff cold-called Jason Rock of Intuitive. He was selling high-speed internet services for a company called Covad. *Id.*, ¶ 7.

Plaintiff and Mr. Rock discussed Intuitive's business, and Plaintiff suggested that he may be able to provide Intuitive with ideas regarding the potential use of Intuitive's S&P product, which was called Global Sector Review. *Id.*, ¶ 8. In March 2002, Plaintiff was asked by Intuitive to prepare a report identifying markets to which that software could be applicable. *Id.*, ¶ 9. Plaintiff prepared said document, and was paid for his efforts. Declaration of Vincent E. Bauer ("Bauer Dec."), Exhibit 1; Bauer Dec., Exhibit 2, pp. 58-59. One of the suggested ways in which the Global Sector Review software could be marketed was to pharmaceutical companies, which needed to file electronically massive amounts of data in connection with their applications to the FDA for approval of drugs. Bauer Dec., Exhibit 1, p. 20. Plaintiff concedes that he sold his rights to the ideas contained in his report to Intuitive, and also concedes that his claims in this case are not predicated upon any ideas contained in that document. Bauer Dec., Exhibit 2, p. 59.

On May 14, 2002, Plaintiff entered into an employment agreement (the "Employment Agreement") with Intuitive. Bauer Dec., Exhibit 3; Rock Aff., ¶ 10. The Employment Agreement was heavily negotiated. Second Amended Complaint, Bauer Dec. Exhibit 4, ¶¶ 103-104. Those negotiations were conducted by Jason Rock, then an Intuitive Member, and Plaintiff. Rock Aff., ¶ 11. Plaintiff modified the terms of a draft of the Employment Agreement, and was

not limited by Intuitive in terms of suggesting changes to the draft agreement.  Bauer Dec.,
Exhibit 2, pp. 78-79; Rock Aff., ¶ 12.

The Employment Agreement provided, inter alia, that Plaintiff, Intuitive's Executive
Vice President of Sales and Marketing, would be eligible to receive sales commissions at the rate
of "10% [of commissionable revenues] for any product line that [Plaintiff helped] create", and 2-
6% for existing services that Intuitive was already involved in.  Bauer Dec., Exhibit 3, p. 2.

The Employment Agreement in no way conferred upon Plaintiff any right to receive
commissions on revenues which were generated subsequent to the termination of his
employment.  Moreover, Plaintiff concedes that, prior to entering into the Employment
Agreement, he gave no thought to the issue of post-termination commissions.  Bauer Dec.,
Exhibit 2, p.107.  Indeed, post-termination commissions were never discussed between Plaintiff
and Intuitive prior to the execution of the agreement.  Rock Aff. ¶ 13; Bauer Dec., Exhibit 2, p.
108.  In that regard, Intuitive never intended the Employment Agreement to confer upon Plaintiff
rights to post-employment commissions.  Id.

The Employment Agreement also provided, under a heading entitled "Product Equity",
Plaintiff with the right to receive "10% of the sale price or IPO for any product line that [Plaintiff
helped] create, minus transaction expenses".  Bauer Dec., Exhibit 3, p. 2.  The Employment
Agreement made it plain that Plaintiff was an "at-will" employee.  Id., p. 1.

Significantly, the Employment Agreement also gave Intuitive the unfettered right to alter
the terms of Plaintiff's employment, with or without cause.  Id.  Plaintiff acknowledged during
his deposition that he believed that language to be unambiguous.  Bauer Dec., Exhibit 2, pp.88-
89.

Plaintiff began to work for Intuitive on June 24, 2002. Rock Aff., ¶ 14. Thereafter, he worked with Intuitive's other employees in connection with the company's efforts to develop three products: the Enwrap Legal Edition; the Enwrap Standard edition, and the Enwrap Collaborative edition. Rock Aff., ¶ 14. None of those three products was ever fully developed by Intuitive. *Id.* ¶ 15. No revenues were generated by Intuitive in connection with any of those three products. *Id.* ¶ 16. In September 2002, Intuitive began to investigate the possibility of modifying the Enwrap software for use in connection with the electronic submission of applications for drug approval by the FDA. *Id.* ¶ 17.

On October 2, 2002, Plaintiff wrote an email to Jason Rock, in which he proposed "amendments" or "clarifications" to his Employment Agreement. Bauer Dec., Exhibit 5; Rock Aff. ¶ 18. In that email, he identified what he testified was a "hole" in his Employment Agreement. Bauer Dec., Exhibit 2, pp. 202-03. Plaintiff's email was in reaction to Mr. Rock telling him that Intuitive had the right to change Plaintiff's sales commissions. Bauer Dec., Exhibit 2, p. 151. (Plaintiff also testified that his own brother had expressed concerns over the interpretation of the Employment Agreement. *Id.*, pp. 157-58) Plaintiff acknowledges that, in response to his "amendment" email, Mr. Rock communicated to him Intuitive's unwillingness to alter the terms of the Employment Agreement per that email. *Id.*, pp. 161-62.

Between September 2002 and March 2003, Plaintiff worked with Intuitive, in part on the development and marketing strategy of the Enwrap Regulatory Submissions Edition software. Rock Aff., ¶ 19. The development of Intuitive Technologies' regulatory submissions software was spearheaded by Jason Rock. *Id.*, ¶ 20. Mr. Rock was the designer and main developer of the software. Id. Jody Montrey assisted Mr. Rock with software development. Rahul Mistry led the project and managed the team. *Id.*, ¶ 21. At times, Mr. Mistry also assisted in development,

testing, and market research. Carl DuRei was the tester for the system, and ensured the software quality. *Id.*, ¶ 21.

Plaintiff was responsible for selling and marketing the software products, including the regulatory submissions software. *Id.*, ¶ 22. In connection with those responsibilities, Plaintiff developed, inter alia, marketing materials, web site content, and help guides. *Id.* In connection with the process of selling the software products, Plaintiff conveyed feedback from the field to the development team. Plaintiff also tested, and detected defects contained in, the software products. *Id.*, ¶ 23.

Plaintiff acknowledges that, to the extent he contributed to the definition of the Enwrap Regulatory Submissions edition product, those contributions were based upon publicly available information, as well as client input regarding their requirements. Bauer Dec., Exhibit 2, p. 171. Thus, he was merely a conduit of extant information, a function regularly performed by sales representatives in the software design area. Plaintiff also acknowledges that he did not write the Regulatory Submissions Edition software, nor did he engage in the normal functions of a software designer. *Id.*, p. 169-71; Rock Aff., ¶ 24.

In October 2002, at the direction of Rahul Mistry, then an Intuitive Member, Plaintiff contacted representatives of the FDA in an effort to solicit their input regarding Intuitive's submissions software. Rock. Aff. ¶ 25. The FDA had agreed to assist certain creators of such software in connection with its desire to facilitate electronic filings of applications for FDA drug approval. *Id.* In November 2002, Mr. Rock and Plaintiff met with representatives of the FDA in that regard. *Id.*, ¶ 26. At the time, Intuitive's submissions software was not yet fully developed. *Id.*

The FDA informed them that they would need to develop a newer version of that software to meet the FDA's needs. Initially, Intuitive tried to modify the products as requested by the FDA, but, due to resource restrictions, was unable to do so. *Id.*, ¶ 27.

In March 2003, the FDA informed Intuitive that it was not interested in evaluating Intuitive's submissions software, instead choosing to evaluate and assist in the development of the submissions software developed by two of Intuitive Technologies' competitors. Rock Aff. ¶ 28. Around that same time, Intuitive Technologies was coming dangerously close to running out of operating capital. Rock Aff. ¶ 29. In May 2003, Mr. Mistry communicated his decision that the company would not pursue FDA-related products in 2003. Rock Aff., ¶ 29.

Plaintiff, in his role as EVP of Sales and Marketing, had been unsuccessful in generating sales. Rock Aff., ¶ 30. Additionally, he repeatedly expressed fundamental disagreement with the vision of Defendant Mistry with respect to the direction of the company. On June 17, 2003, Plaintiff's at-will employment was terminated. Rock Aff., ¶ 30.

Nearly a year later, in connection with a strategic session with Kenneth Kay, an investor, FDAsubmit, the successor to Intuitive, decided to investigate the creation of a prescription drug application reviewing system in the hopes of selling that software to the FDA. *Id.*, ¶ 31. By way of background, the FDA had for years used its own "reviewer" software. In May 2004, the FDA communicated its belief that its own software was inadequate, and invited companies to make proposals for the sale of reviewer software. *Id.*, ¶ 32.

Thereafter, for more than one year, FDAsubmit devoted its energies to the creation of submissions review software for the FDA. *Id.*, ¶ 33. Both Mr. Rock and Mr. Mistry were solely focused on that software design and development. Id. Approximately 7000 staff- hours were devoted to the development of the initial versions of that software. *Id.*, ¶ 34. In efforts to

7

expedite the creation of the review and validation system, FDAsubmit outsourced the testing and some aspects of the software development to an outside consulting firm. *Id.*

Ultimately, in June 2005, GlobalSubmit (formerly FDAsubmit – the company changed its name in response to the wishes of prospective non-US clients, which didn't respond positively to FDA being in the company's name ) completed development with respect to the new software, named FDAload and FDAreview (the software was designed and sold as two distinct software packages), which processed and analyzed applications for FDA approval of prescription drugs, and contained a viewer system which provides a reviewer with a way to view the submissions and any errors contained therein. Rock. Aff., ¶ 35. Although the company benefitted in its development of the reviewer software from the institutional knowledge gained by it in the development of the FDA submission software, the FDA reviewer software was actually based upon the Standard & Poor's reviewer software which, like the FDA reviewer software and unlike the FDA submissions software, had the capacity to enable reviewers to validate (in a limited sense), interpret, organize and analyze data. *Id.*, ¶ 36. None of the features of that reviewer software were both common to the features of the Enwrap software but not common to the features of Enwrap's predecessor software, the S&P reviewer software (with the exception of features common to many software products). *Id.*, ¶ 37. Moreover, none of the object and source codes used in the creation of the FDA submissions software was reused in the creation of the FDA reviewer software – that code was generated afresh, with the exception of code common to many software products which is readily available via the internet. *Id.*, ¶ 38.

In February 2005, GlobalSubmit was informed that none of the reviewer products submitted to the FDA for its consideration (including GlobalSubmit's product) was adequate for the FDA's purposes. One of the deficiencies of GlobalSubmit's software, as identified by the

FDA, was that it did not have a comprehensive validation capability. Rock Aff., ¶ 39.
Thereafter, in June 2005, the FDA agreed to enter into a Cooperative Research and Development
Agreement (CRADA) with GlobalSubmit for the "design, development and deployment of an
electronic submission review tool at FDA…[whereby the company would] provide all software
and enhancement programming services at no charge to FDA". Bauer Dec., Exhibit 7; Rock
Aff., ¶ 40. A major reason why the FDA chose GlobalSubmit in this regard is that the product
they developed enabled a viewer to open a submission very quickly, whereas the products
created by competitors were dramatically slower. Rock Aff. ¶ 40.

    Subsequently, in June 2006, GlobalSubmit entered into an agreement with the FDA
whereby it would maintain and support the reviewer software for a fee. Rock Aff., ¶ 41. As the
result of that arrangement, the company was able to begin selling that FDA reviewer software to
drug companies. *Id.*, ¶ 41. Ultimately, GlobalSubmit did not generate revenues in connection
with that software until July 2005, 25 months after the termination of Plaintiff's employment.
*Id.*, ¶ 42.

    GlobalSubmit has continued to devote great effort and expense to the development of its
products since FDAload and FDAreview were developed, in order to stay competitive with the
other companies in its industry. The development of FDAload 2 and FDAreview 2.5 was
completed in or around June 2005. *Id.*, ¶ 43. During 2005, GlobalSubmit created the validation
software the FDA had indicated it required. Rock. Aff., ¶ 44. Significantly enhanced versions of
both GlobalSubmit's review and validation software, GlobalSubmit Review 3 and Validate 3,
were released around the end of that year. *Id.* Development continued, and GlobalSubmit
Review 4 and Validate 4 were released in early 2007. *Id.*, ¶ 45. Thereafter, in early 2009,
GlobalSubmit Validate 5 was released. *Id.*, ¶ 45.

While not necessary to the Court's determination on this motion, it bears noting that even the earliest iterations of GlobalSubmit's review and validation software were radically different from the Enwrap Regulatory Submissions Edition software. For example, unlike the Enwrap product, GlobalSubmit Review 2 (as well as the more recent versions of that software) had no capability to support the publishing of a submission of a drug approval application to the FDA, which was the primary function of the Enwrap Regulatory Submissions Edition software. Rock Aff., ¶ 46. And, while the Enwrap product had a very rudimentary validation capacity (it checked for 5 filing errors), GlobalSubmit Validate was a product whose sole purpose was to check for errors in a submission, and which checked for over 100 potential filing errors. Rock Aff., ¶ 47 ; Transcript of deposition of Ivan Zatkovich (Plaintiff's technological expert witness), Exhibit 8 to Bauer Dec., pp.128-29.

Plaintiff concedes that he is not entitled to recover monies in this action based upon the idea to pursue the development of software in connection with the FDA submission process, since he sold that idea to Intuitive before his employment began. Bauer Dec., Exhibit 2, p. 59. Instead, he suggests that he is entitled to sales commissions with respect to revenues generated from those products, as well as a 10% equity interest in GlobalSubmit, because he allegedly defined product features and capability for the Enwrap Regulatory Submissions Edition software. *Id.*, p. 171.

However, any such efforts were not helpful to the development of the GlobalSubmit Review and GlobalSubmit Validate products. In fact, those products were developed from scratch, and not from the Enwrap software. Rock. Aff., ¶ 49. Moreover, the features and capabilities of the GlobalSubmit products were developed in response to the specific requirements of the FDA, and not from Plaintiff's efforts. *Id.*, ¶ 50. Additionally, none of the

10

object or source code for the GlobalSubmit products was derived from the Enwrap product. Instead, it was written afresh. *Id.*, ¶ 51. And that process took 13 months initially, and the development of the several subsequent iterations of the GlobalSubmit products has taken extensive effort over the last 4 years. *Id.*, ¶ 52.

## ARGUMENT

I.   **PLAINTIFF'S BREACH OF CONTRACT CLAIMS
     SHOULD BE DISMISSED**

Plaintiff's First, Second and Third Causes of Action sound in breach of contract, and arise out of the same claim for sales commissions and an "equity interest". For the following reasons, these causes of action should be dismissed in their entirety.

**a. Plaintiff is Not Entitled to Post-Termination Commissions**

It is well-established law that contract interpretation is a question of law. Philippine Sugar Estates Development Co. v. Government of Philippine Islands, 247 U.S. 385 (U.S. 1918); Terre Haute & I. R. Co. v. Indiana, 194 U.S. 579 (U.S. 1904); Aon Fin. Prods. v. Societe Generale, 476 F.3d 90 (2d Cir. 2007)(Second Circuit reversed lower court's ruling based on unambiguous language of contract); 38 Sequoia Assocs., LLC v. Lumbermen's Mut. Cas. Co., 114 Fed. Appx. 28 (2d Cir. 2004) (interpretation of contract is question of law); Eddy v. Prudence Bonds Corp., 165 F.2d 157, 163 (2d Cir. 1947) ("appellate courts have untrammelled power to interpret written documents" because these are questions of law). Whether the contract is ambiguous is also a question of law for a judge to determine. Aon Fin. Prods. v. Societe Generale, 476 F.3d 90, 95 (2d Cir. 2007). Moreover, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation."

Hunt, Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) (holding that trial court properly interpreted unambiguous contract in a case involving employee placement services contract, but did vacate judgment because lower court failed to properly analyze which bookings were attributable to appellant).

It is also well-settled in New York that "[a]n at-will [employee] is entitled to post-discharge commissions only if the parties' agreement expressly provided for such compensation." Swits v. New York Systems Exchange, Inc., 281 A.D.2d 833 (3rd Dep't 2001)(quoting Production Products Co. v. Vision Corp., 270 A.D. 2d 922, 923 (4th Dep't 2000); McGimpsey v. Robert Folchetti & Assocs., LLC, 19 A.D.3d 658 (2nd Dep't 2005)(granting summary judgment on claim for  post-termination commissions where subject commission agreement did not expressly provide for such compensation); Graff v. Enodis Corp., 2003 U.S. Dist. LEXIS 4899 at *6 (S.D.N.Y. 2003)(citing Swits and denying claim for post-termination commissions); UWC, Inc. v. Eagle Industries, Inc., 213 A.D.2d 1009 (4th Dep't 1995)(holding that an at-will employee is entitled to post-termination commissions only if the parties' agreement expressly provided for such compensation); Seigel v. Techlaw, Inc., 21 Misc. 3d 131A (N.Y. App. Term 2008);Zaveri v. Rosy Blue, Inc., 4 A.D.3d 146 (1st Dep't 2004);  McEntee v. Van Cleef & Arpels, Inc., 166 A.D.2d 359 (1st Dep't 1990); Mackie v. LaSalle Industries, Inc., 92 A.D.2d 821 (1st Dept. 1983); Frishberg v. Esprit de Corp., 778 F. Supp. 793, 795-804 (S.D.N.Y. 1991) aff'd 969 F. 2d 1042(2d Cir. 1992).

As discussed above, Plaintiff did not generate any commissionable revenues during the period of his employment.  Instead, he seeks commissions with respect to sales which did not even commence until two years after the termination of his employment, and claims that he is entitled to such commissions in perpetuity.  Bauer Dec., Exhibit 2, p. 106.  Plaintiff cannot even

argue that he played any role in procuring the extant agreements with GlobalSubmit customers who have licensed and/or who are licensing the GlobalSubmit Review and GlobalSubmit Validate products.

The operative provision in Plaintiff's Employment Agreement is entitled Sales Commissions, which plainly suggests that Plaintiff is only entitled to commissions in connection with sales in which he played a role. The language in that section provides, inter alia, that Plaintiff, Intuitive's Executive Vice President of Sales and Marketing, would be eligible to receive commissions at the rate of "10% [of commissionable revenues] for any product line that [Plaintiff helped] create", and 2-6% for existing services that Intuitive was already involved in. That provision in no way confers upon Plaintiff a right to post-termination commissions. Bauer Dec., Exhibit 3.

Plaintiff had an ample opportunity to amend the provision to include a reference to post-termination commissions, if he had thought that Intuitive was agreeing to pay those to him. He did not include such a reference, because, as he admitted during his deposition, he never even thought about post-termination commissions. Bauer Dec., Exhibit 2, p. 107. In fact, he never discussed post-termination commissions with anyone from Intuitive. *Id.*, p. 108 And that is because he didn't expect them.

As he testified, Plaintiff had worked at several jobs in which he had a commission scheme, and understood that it was standard that a sales person had to be involved in a sale in order to be entitled to a commission. *Id.*, p. 296-97; 204-05. Moreover, during Plaintiff's tenure, Intuitive had generated revenues in connection with its consulting services which existed at the time Plaintiff entered into the employment agreement. Plaintiff was aware of those revenues, but never asked for a percentage of them. *Id.*, p. 101-02, 119, 295. The reason he did not is that he

13

was not involved in the process of selling those services, and so understood that he was not entitled to receive commissions in connection therewith. *Id.* Thus, he implicitly concedes that his agreement does not confer upon him the right to commissions on sales with respect to which he was not involved. In that regard, during his deposition, Plaintiff also testified that normally a sales person gets commissions on sales he personally makes, and that he was "not sure" whether the language required him to be involved in sales in order to be entitled to a commission.

Also illustrative of Plaintiff's understanding that he needed to be involved in the sales process in order to receive commissions under his agreement is his attempt to "amend" his agreement to provide him with a right to post-termination commissions. As Plaintiff testified, he made this attempt in response to a concern raised by his brother that there was a "hole" in Plaintiff's Employment Agreement, namely that his right to commissions could be extinguished by the termination of his employment. *Id.*, p. 202-203. Indeed, there was such a "hole", since Intuitive never agreed to pay commissions to Plaintiff for revenues generated both after Plaintiff's employment term and with respect to which Plaintiff had no involvement.

Finally, even if the Court were to adopt Plaintiff's interpretation of the Sales Commission section of the Employment Agreement, it still should dismiss Plaintiff's claim for post-termination sales commissions, because any agreement with respect thereto was modified by Inuitive, as the Company plainly had a right to do, when Jason Rock communicated to Plaintiff that the Employment Agreement did not confer such a right upon Plaintiff. That message was communicated in or around October 2002, after Intuitive had only begun its efforts to develop the Enwrap Regulatory Submissions edition software. Bauer Dec., Exhibit 2, p. 161-62; Rock Aff., ¶ 53. Plaintiff's "development efforts" thereafter, if any, were engaged in with the full understanding that Intuitive did not agree to pay Plaintiff sales commissions in connection with

14

post-termination revenues.  Accordingly, Plaintiff is not entitled to any commissions, and his breach of contract claims therefor should be dismissed.

**b.  Plaintiff's Product Equity Claims Should be Dismissed**

In his First, Second and Third causes of action, Plaintiff also seeks to recover damages in connection with the section of his Employment Agreement entitled "Product Equity".  That section provides that Plaintiff was "entitled to 10% of the sale price or IPO for any product line that [he] help[ed] create, minus transaction expenses."

It is undisputed that there has been no sale of or initial public offering respecting either any Enwrap product or any of the products created since the termination of Plaintiff's employment.  Rock Aff., ¶ 54.  Despite that obvious fact, and the clear language of that section, which gives rise to a payment obligation only in the event of an outright sale (as opposed to licensing) of a relevant product line or in the event of an IPO for same, Plaintiff blithely argues that he has an equity interest in the Company, as opposed to relevant products.

Plaintiff's interpretation is absurd.  First, it is plainly inconsistent with the clear language of the provision.  Moreover, Plaintiff's interpretation allows for a huge windfall possibility.  Specifically, to adopt Plaintiff's interpretation, he is entitled to 10% of the value of the company at a time of his choosing, and regardless of whether the company was selling products which he helped develop or not.  Plainly, that interpretation cannot be valid.  In that regard, courts have held in the employment context that contracts should be viewed in light of the circumstances facing the parties at that time and that " [a]construction should not be placed upon the contract which would give an unfair advantage to one party over the other, unless such was their manifest intention when the contract was made." American Realty Co. v. Curran, 258 F. 118, 120 (2d Cir.1919) (in an employment contract under which plaintiff was to cut and deliver wood, the

court found that since the contract was silent regarding who was to provide the cars, the employer was under no duty to do so). "[C]onstruction of a contractual clause which would produce an unreasonable result by placing one party at the mercy of the other is against the general policy of the law" R.B. Williams Holding Corp. v. Ameron Int'l Corp., 2001 U.S. Dist. LEXIS 2812 at 31 (W.D.N.Y. 2001), citing Mandelblatt v. Devon Stores, 132 A.D.2d 162, 167 (1st Dep't 1987) (a New York employment case).  This is such a case, where to permit Plaintiff to enforce his expansive interpretation of the "product equity" provision to confer an equity interest in the entire company would be to place GlobalSubmit at his mercy.  The Court simply should not allow that to happen.

### c.   Plaintiff Cannot Recover "Royalties" Under the Product Equity Section of the Employment Agreement

Although not clearly articulated in his Second Amended Complaint, Plaintiff has articulated informally that he is claiming a right to recover "royalties" under the Product Equity section of his Employment Agreement.  Plainly, any such claim should be dismissed, since the language in that section clearly does not confer upon Plaintiff any right to either "royalties" or sales commissions.  Therefore, Plaintiff's wildly expansive "interpretation" of that language (which, if adopted, would result in him having a purported right to 20% of the company's gross product sale revenues -- 10% sales commissions plus 10% "royalties") should be rejected.

## II.   PLAINTIFF'S FRAUD CLAIMS SHOULD BE DISMISSED

Plaintiff's Fourth and Sixth Causes of Action, both of which sound in fraud, also should be dismissed.  At the core of each of those nearly identical claims are: Plaintiff's allegation that he was fraudulently induced to enter into the May 14, 2002 contract by Defendants' "fraudulent representations and assurances that they would honor the contract" see, e.g., Bauer Dec., Exhibit 4, ¶¶ 184-86; and Plaintiff's allegation that Intuitive's "proposed affiliation with Jumpstart and Kenneth Kay was to further advance their collective business interests, and not to deprive Plaintiff of his ownership interest in the company and its product lines." Bauer Dec., Exhibit 4, ¶ 193.

It is well-settled in New York that where, as here, a fraud claim arises out of the same facts that form the basis of a plaintiff's cause of action for breach of contract, the plaintiff has failed to state a legally sufficient cause of action.  Bridgestone/Firestone v. Recovery Credit Services, 98 F. 3d 13 (2d Cir. 1996); Sudul v. Computer Outsourcing Services, 868 F. Supp. 59,62(S.D.N.Y. 1994)("Where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract"); Locasio v. Aquavella, 185 A.D.2d 689 (4th Dep't 1992); McKernin v. Fanny Farmer Candy Shops, Inc., 176 A.D.2d 233 (2d Dep't 1991); Metropolitan Transportation Auth. v. Triumph Advertising Productions, 116 A.D.2d 526 (1st Dep't 1986).

Here, Plaintiff has predicated his various fraud claims upon: the alleged breach of the May 14, 2002 contract; and a wholly unsupported claim that Defendants never intended to honor that contract.  Therefore, those claims must be dismissed as a matter of law.  Moreover, Plaintiff, during his deposition, admits that he cannot say that Intuitive did not intend to live up

17

to its obligations under the Employment Agreement at the time it was signed. Bauer Dec., Exhibit 2, pp.284-86. Accordingly, these claims are frivolous.

In a similar vein, Plaintiff alleges that he was defrauded into continuing to work for Intuitive by representations that investments by Jumpstart and Ken Kay would work to his advantage. Bauer Dec., Exhibit 4, ¶ 193. However, during his deposition, Plaintiff admitted that he was plainly told that Intuitive would not agree to the amendments he requested to his Employment Agreement, thus putting him on notice of Intuitive's position even before Intuitive sought financing. Bauer Dec., Exhibit 2, pp. 161-62. Moreover, Plaintiff has no evidence that Intuitive obtained financing for the purpose of depriving him of his contractual rights. Indeed, that proposition is ridiculous, since obtaining financing would only enable Intuitive to pay Plaintiff, not the opposite. Thus, this component of Plaintiff's fraud claim should also be dismissed.

## III. PLAINTIFF'S CLAIM FOR RESTITUTION AND UNJUST ENRICHMENT SHOULD BE DISMISSED

Plaintiff's Fifth Cause of Action, for restitution and unjust enrichment, should also be dismissed. Under New York law, a cause of action for unjust enrichment is a quasi-contract claim, which only exists when there is no contract. IDT Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132 (2009); Goldman v. Metro. Life Ins. Co., 5 N.Y.3d 561 (2005); Yenrab, Inc. v. 794 Linden Realty, LLC, 2009 N.Y. App. Div. LEXIS 8840 (2d Dep't Dec. 1, 2009); Gibraltar Mgt. Co., Inc. v. Grand Entrance Gates, Ltd., 46 A.D.3d 747 (2d Dep't 2007) ; Auble v. Doyle, 38 A.D.3d 1264 (4th Dep't 2007). In cases where there is a contract, an unjust enrichment claim is duplicative of a breach of contract claim and cannot lie. Unclaimed Prop. Recovery Serv., Inc. v. UBS PaineWebber Inc., 58 A.D.3d 526 (1st Dep't 2009)(a contract existed, therefore unjust

enrichment claim would be duplicative); Nikitovich v. O'Neal, 40 A.D.3d 300 (1st Dep't 2007) (employee's unjust enrichment claim duplicative where contract existed and claim was based on contract); Bouchard Transp. Co., Inc. v. New York Islanders Hockey Club, LP, 40 A.D.3d 897 (2d Dep't 2007)(unjust enrichment claim should have been dismissed as duplicative.); Gibraltar Mgt. Co., Inc. v. Grand Entrance Gates, Ltd., 46 A.D.3d 747 (2d Dep't 2007)(no independent unjust enrichment claim apart from breach of contract claim). In this case, Plaintiff's alleged claims arise from a written contract. Therefore, as a matter of law, there can be no unjust enrichment claim.

As there is no colorable claim for unjust enrichment, Plaintiff cannot recover restitution. Under New York law, unjust enrichment is a prerequisite for restitution. Slater v. Gulf, M. & O. R. Co., 307 N.Y. 419 (1954) (there is no restitution without unjust enrichment); Milman v. Denniston, 271 A.D. 988 (2d Dep't 1947); see also, AGF York 57 L.P. v. Glikman, 24 Misc. 3d 1225A (Sup. Ct. N.Y. Cty. 2009)(restitution is a remedy for unjust enrichment); L & L Auto Distribs. & Suppliers Inc. v. Auto Collection, Inc., 23 Misc. 3d 1139A (Sup. Ct. Kings Cty. 2009)(restitution is equitable remedy for plaintiff who establishes unjust enrichment and will not lie if there is a written contract). Plaintiff cannot establish unjust enrichment. Therefore, he cannot sustain a claim for restitution.

## IV.  PLAINTIFF'S WRONGFUL TERMINATION CLAIM SHOULD BE DISMISSED

Plaintiff's Eighth Cause of Action, for wrongful termination and harassment, also should be dismissed. It is well-settled that there is no cause of action for wrongful or abusive discharge in New York. Horn v. N.Y. Times, 100 N.Y.2d 85, 96 (2003)(" We have consistently declined to create a common-law tort of wrongful or abusive discharge, or to recognize a covenant of good faith and fair dealing to imply terms grounded in a conception of public policy into

employment contracts"); <u>McHenry v Lawrence</u>, 66 A.D.3d 650,651 (2d Dep't 2009)("New York does not recognize a cause of action for the tort of abusive or wrongful discharge of an at-will employee"). Where, as here, employment is at will, an employee may be discharged at any time, for any reason or no reason at all. <u>Trakis v. Manhattanville Coll.</u>, 51 A.D.3d 778 (2d Dep't 2008); <u>Barcellos v. Robbins</u>, 50 A.D.3d 934 (2d Dep't 2008)(an at will employee can be discharged at any time with or without cause).

In that regard, while Plaintiff asserts in his Complaint that he was terminated for an illegal purpose, he makes no effort to allege what that supposed violation of law is. Indeed, there is none. Accordingly, Plaintiff fails to state a claim for wrongful termination, and therefore that claim must be dismissed. Moreover, his unspecified "harassment" claim seems to sound in constructive discharge. Since, however, Plaintiff maintains that he did not resign, that claim is nonsensical and should also be dismissed.

## V. PLAINTIFF'S BREACH OF FIDUCIARY DUTY CLAIM SHOULD BE DISMISSED

Plaintiff's Fifteenth Cause of Action should also be dismissed. In that regard, Plaintiff alleges that "[e]ach of the Defendants owed Plaintiff fiduciary duties and their undivided and unqualified loyalty as a result of Plaintiff's position as an officer and Executive Vice President of INUITIVE and as a result of his equity ownership in Defendants' businesses and their products and product lines." Second Amended Complaint, ¶ 289. That assertion is flatly incorrect.

First, there is no authority under New York law for the proposition that an employee is owed a fiduciary duty merely because he is an officer of his employer. The relationship between an employer and its employee, even where the employee has a commissions agreement with the employer, is not fiduciary in nature. See, e.g., <u>Sanshoe Trading Corp. v. Mitsubishi Int'l Corp.</u>,

122 Misc. 2d 585 (Sup. Ct. N.Y. Cty 1984)(holding that there was no fiduciary duty owed to a commissions sales agent because at most the parties shared an interest in the amount of sales the defendants would be able to effect); Waldman v. Englishtown Sportswear, Ltd., 92 A.D.2d 833 (1st Dep't 1983)(holding that the fact that defendant may owe money to plaintiff for compensation does not make defendant a fiduciary).

      Moreover, Plaintiff's supposed "equity interest" in Intuitive does not give rise to a fiduciary duty to him, since it is not in fact an equity interest.  Instead, as discussed above, at most it is a promise to make certain payments to Plaintiff in the event of certain specified transactions.  Unlike an equity interest, Plaintiff is not obligated to share in any losses incurred by Intuitive.  It is well established law that an agreement between an employer and employee to share in profits does not give rise to a fiduciary relationship, absent an express agreement to share in losses as well. Vitale v. Steinberg, 307 A.D.2d 107 (1st Dep't 2003); Michnick v. Parkell Prods., 215 A.D.2d 462 (2d Dep't 1995); Reichert v. N. MacFarland Builders, Inc., 85 A.D.2d 767 (3d Dep't 1981); Silverman v. Keller, 2006 N.Y. Misc. LEXIS 4080, 1-47 (N.Y. Sup. Ct. 2006). The mere fact that the employee is dependent upon the employer to calculate the profits does not convert the employment relationship into a fiduciary one.  Vitale v. Steinberg, 307 A.D.2d 107 (1st Dep't 2003).  Thus, Plaintiff cannot establish any fiduciary relationship between any of the Defendants and himself, and his breach of fiduciary duty claim should therefore be dismissed.

## VI.   PLAINTIFF'S TORTIOUS INTERFERENCE CLAIMS SHOULD BE DISMISSED

In his Fourteenth Cause of Action, Plaintiff has brought claims of "interference with contract" and "inducing breach" against Defendants Rock, Mistry, FDAsubmit, and GlobalSubmit. These claims should be dismissed as well.

Only a stranger to a contract can be held liable for tortious interference with a contract. Koret, Inc. v. Christian Dior, S.A., 161 A.D.2d 156 (1st Dep't 1990). In that regard, it goes without saying that FDAsubmit and GlobalSubmit, both legal successors to Intuitive, cannot be liable for a breach of contract by their predecessor (in fact, since those entities didn't exist at the same time, it is a factual impossibility that the successors could have induced the predecessor to do anything). Moreover, Defendants Rock and Mistry, both employees and therefore agents of Intuitive, cannot be liable for tortious interference, since they are also not strangers to the Employment Agreement. First Trust N.A. v. Moses & Singer, 2000 U.S. Dist. LEXIS 10957, 1-24 (S.D.N.Y. Aug. 4, 2000)(agent acting on behalf of principal is not stranger to contract); Nu-Life Constr. Corp. v. Board of Educ., 204 A.D.2d 106 (1st Dep't 1994)(employee could not be held liable for inducing employer to breach a contract with a third person).

Defendants Mistry and Rock, as agents of their employer, GlobalSubmit, acted as agents of GlobalSubmit in denying Plaintiff the payments he claims to be owed. Additionally, they participated in the negotiation of the Employment Agreement with Plaintiff. Thus, they are not strangers to the Employment Agreement. Koret, Inc. v. Christian Dior, S.A., 161 A.D.2d 156 (1st Dep't 1990) (agents who participated in negotiation of contract were not strangers to contract); MTI/The Image Group, Inc. v. Fox Studios East, Inc., 262 A.D.2d 20(1st Dep't 1999)(same).

Plaintiff does not, therefore, state a legally sufficient claim for tortious interference, but rather a claim duplicative of his breach of contract claim. Under New York law, a plaintiff

cannot simply re-allege the same facts that underlie the contract claim in an attempt to bootstrap an insufficient tortious interference claim. <u>Allerand, LLC v. 233 E. 18th St. Co., L.L.C.,</u> 19 A.D.3d 275 (1st Dep't 2005)(plaintiffs' claim of tortious interference does nothing but restate their breach of contract claim and therefore is legally insufficient); <u>Silverman v. Carvel Corp.,</u> 8 A.D.3d 469 (2d Dep't 2004)(cause of action sounding in tortious interference was duplicative of cause of action sounding in breach of contract and failed to assert an independent wrong); <u>JHH Pictures, Inc. v. Rawkus Entm't LLC, 291 A.D.2d 356</u> (1st Dep't 2002) (plaintiff's tortious interference claim was grounded in the claim that the defendants failed to live up to contractual obligations; therefore claim was properly dismissed as duplicative). Thus, Plaintiff's Fourteenth Cause of Action should be dismissed.

## VII. PLAINTIFF'S ALTER EGO AND RELATED FRAUD CLAIMS SHOULD BE DISMISSED

Plaintiff's Seventh, Ninth and Tenth causes of action, for "agency/instrumentality/alter ego liability" and related fraud (allegedly changing company name to avoid liability), respectively, are not independent causes of action, but rather theories under which Plaintiff is attempting to impose contractual obligations to pay commissions upon parties other than Intuitive. Those claims must be dismissed because, among other reasons, the claims upon which they are based are subject to dismissal. Additionally, despite discovery being completed in this case, Plaintiff is unable to provide any evidence that the corporate Defendants in this case, Intuitive and its successors, FDAsubmit and GlobalSubmit, were the alter egos of individual Defendants Mistry and Rock, or that the corporate entities were used by Defendants to perpetrate a fraud against Plaintiff. As set forth in the Affidavit of Jason Rock, Intuitive was merged into FDAsubmit for legitimate business reasons, and the company's name change to GlobalSubmit was also done for

business reasons unrelated to Plaintiff. Rock Aff., ¶¶ 31, 35. Defendants have never taken the position that FDAsubmit and GlobalSubmit are not successors to Intuitive. The suggestion that Defendants have attempted to avoid liability through corporate changes is therefore baseless, and Plaintiff's Seventh, Ninth and Tenth causes of action should be dismissed.

## VIII. <u>PLAINTIFF'S CLAIM FOR AN ACCOUNTING SHOULD BE DISMISSED</u>

Plaintiff's Eleventh Cause of Action, in which he requests an accounting, must also be dismissed.

"Under New York law a plaintiff must allege facts demonstrating either a fiduciary or a confidential relationship with a defendant to sustain an equitable action for an accounting." <u>Argent Elec., Inc. v. Cooper Lighting, Inc.</u>, 2005 U.S. Dist. LEXIS 18689 at *26 (S.D.N.Y 2005). As set forth in Point V, there is no fiduciary relationship between any of the Defendants and Plaintiff. As a result of the absence of any fiduciary relationship, an accounting in this case is inappropriate. <u>Michnick v. Parkell Prods.</u>, 215 A.D.2d 462 (2d Dep't 1995); <u>see also</u> <u>Reichert v. N. MacFarland Builders, Inc.</u>, 85 A.D.2d 767 (3d Dep't 1981) (an agreement that provides for employee to share in profits but not losses does not create a fiduciary relationship; therefore an accounting is inappropriate).

## IX. <u>PLAINTIFF'S APPLICATIONS FOR INJUNCTIVE RELIEF ARE MOOT</u>

Plaintiff's Twelfth and Thirteenth causes of action are not independent claims, but rather requests for injunctive relief pending the resolution of this action. Since no motion has been brought concerning this requested relief, Defendants submit that no discussion of these "claims" is warranted.

24

## **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that the Court grant Defendant's motion for summary judgment in its entirety, and grant them such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      February 10, 2010

                Respectfully submitted,

                LAW OFFICES OF VINCENT E. BAUER

                By:_____
                    Vincent Bauer (VB- 0794)
                475 Park Avenue South
                New York, New York 10016
                (212) 575-1517 (Phone)
                (212) 689-2726 (Facsimile)

                *Attorneys for Defendants*